## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **MARA CASSATA**, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br>v.<br><br>**RHODE ISLAND CREDIT UNION**,<br><br>        Defendant. | Case No. 1:22-cv-00358<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Mara Cassata, on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to others:

### INTRODUCTION

1.     Plaintiff brings this action on behalf of herself and two classes of similarly situated individuals ("Classes") against Defendant Rhode Island Credit Union ("Defendant") over the (1) improper assessment and collection of thirty-five ($35.00) overdraft fees ("OD Fees") on debit card transactions authorized on sufficient funds, (2) violation of Regulation E of the Electronic Fund Transfer Act, 12 C.F.R. § 1005.17, and (3) the assessment of multiple fees on an item.

2.     Besides being deceptive, this practice breaches Defendant's standardized adhesion contract, which is comprised of the "What You Need to Know about Overdrafts and Overdraft Fees" document, Ex. A attached hereto and the "Rhode Island Credit Union Fee Schedule" document, Ex. B attached hereto (the "Contract").

1

3.  The practice also breaches Defendant's duty of good faith and fair dealing, unjustly enriches Defendant to the detriment of its customers, and violates the Rhode Island Unfair Trade Practice and Consumer Protection Act, *RI Gen L § 6-13.1 - 29*.

4.  Plaintiff also alleges that because Defendant provided inaccurate and untruthful overdraft information to Plaintiff and the Classes regarding the overdraft practice, under Regulation E of the Electronic Funds Transfer Act, 12 C.F.R. § 1005, Defendant was not authorized to assess OD Fees to consumers for debit card and non-recurring debit card charges. However, Defendant did charge its customers overdraft fees for ATM and debit card charges.

5.  Through the imposition of these fees, Defendant has made substantial revenue to the tune of millions of dollars, seeking to turn its customers' financial struggles into revenue. Unfortunately, Plaintiff, like thousands of others, has fallen victim to Defendant's fee revenue maximization schemes.

## PARTIES

6.  Plaintiff is a Bristol, Rhode Island citizen and has maintained a checking account with Defendant at all times relevant hereto.

7.  Defendant is a credit union with more than $400 million in assets, and its principal place of business is in Providence, Rhode Island.

## JURISDICTION AND VENUE

8.  This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9.  Jurisdiction is also proper pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) because: 1) the claims of the proposed Classes, when aggregated together, exceed

$5,000,000, and 2) some putative members of the Classes are residents of different states than Defendant.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 139(b)(1) because Defendant is a resident and does business in this District, and a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## BACKGROUND FACTS

11.    Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *Overdraft Revenue Inches Up in 2018*, https://bit.ly/3cbHNKV.

12.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed OD Fees. *Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts* 8 (June 2014), https://bit.ly/3ksKD0I.

13.    Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

14.    In line with this industry trend, the New York Attorney General recently asked other industry-leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

3

15.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  The Contract

16.     At all times material hereto, Plaintiff had a checking account governed by the Contract.

17.     The Contract is a standardized form of contracts for deposit accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all deposit account customers.

### B.  Overview of the Claim

18.     Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what is referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

19.      Here is how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

4

20.    However, Defendant still assesses crippling $35 OD Fees on many of these transactions and misrepresents its practices in the Contract.

21.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

22.    Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

23.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

24.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to

account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

25.    Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

26.    The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They, therefore, could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to disclosing overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the

fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

27.    There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. However, Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

28.    Nevertheless, Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

29.    Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**A.  Mechanics of a Debit Card Transaction**

30.    A debit card transaction occurs in two parts. First, the merchant instantaneously obtains authorization for the purchase amount from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

31.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the transaction amount but does not yet transfer the funds to the merchant.

32.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

33.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry-wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

34.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**B. Defendant's Contract**

35.     Plaintiff had a Defendant checking account at all times material hereto governed by the Contract. Ex. A.

36.     Defendant promises in the Contract that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A.

37.      In breach of this promise, Defendant assesses $35 OD Fees on debit card transactions when there is "enough money in your account to cover a transaction."

38.      Defendant further promises that authorization and payment occur simultaneously and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction:

> We do ***authorize and pay*** overdrafts for the following types of transactions:
>
> - Checks and other transactions made using your checking account number
> - Automatic bill payments
>
> We will not ***authorize and pay*** overdrafts for the following types of transactions without your consent.
>
> - ATM transactions
> - Everyday debit card transactions
>
> We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction.
>
> If we do not ***authorize and pay*** an overdraft, your transaction will be declined.
>
> …
>
> What if I want Rhode Island Credit Union to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions?
>
> If you want us to ***authorize and pay*** overdrafts on everyday debit card transactions . . .
>
> _____
>
> I do not want Rhode Island Credit Union to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.
>
> …
>
> I want Rhode Island Credit Union to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. A (emphasis added and removed from original).

39.    In total, Defendant links payment to authorization **eight (8)** times, meaning that transactions are paid, and therefore overdrafts are determined at authorization.

40.    For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

41.    The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. But, of course, that is not true for APSN Transactions.

42.    In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

43.    All of the above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

44.    First and most fundamentally, Defendant charges OD Fees on debit card transactions for which sufficient funds are available to cover throughout their lifecycle.

45.    Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

46.     Next, sufficient funds for APSN Transactions are immediately debited from the account, consistent with standard industry practice.

47.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. However, that is what Defendant does when it re-debits the account during a secret batch posting process.

48.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of a transaction of authorization and later at the time of settlement.

49.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

50.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

51.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

52.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

53.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

54.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

55.     For example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100. Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://bit.ly/3kX0iXo (emphasis in original).

56.     Defendant and its accountholders make no such agreement.

## C. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

57.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent

transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

58.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

59.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards as the money comes directly out of the checking account.

60.    Consumer Action, a national nonprofit consumer education, and advocacy organization, advises consumers in determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card, you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

61.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years. With that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

62.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash permanently and irreversibly.

63. Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

64. In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

65. Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

14

66.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

67.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this widespread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

68.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

69.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

70.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

**D. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

71.     On or around October 13, 2021, and October 22, 2021, Plaintiff was assessed $35 OD Fees, even though the transactions that purportedly caused these fees had been previously authorized on sufficient funds.

72.    Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

## II.    DEFENDANT VIOLATED REGULATION E OF THE ELECTRONIC FUND TRANSFER ACT, 12 C.F.R. § 1005.17.

### C.  Regulation E Overview

73.    The federal government has also stepped in to provide additional protections to consumers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted a regulation permitting financial institutions to charge overdraft fees on ATM and one-time debit charges only if the institution first obtained the customer's affirmative consent. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

74.    To qualify as affirmative consent, the opt-in notice/agreement must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft;

- The opt-in consent must be obtained separately from other consents and acknowledgments;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different items for the account depending on whether the customer opted into the overdraft program.

75.     If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of the Opt-In Rule, then it is not allowed to charge overdraft fees on ATM and one-time debit card transactions.

76.     At all relevant times, Defendant has had an overdraft program in place for assessing overdraft fees on ATM and debit card transactions, which is: (1) contrary to the express terms of its contracts with its members; (2) contrary to how Defendant represents its overdraft program to its members; and (3) contrary to what members expect when assessed overdraft fees.

77.     Defendant promises in the Contract that "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. A.

78.     In breach of this promise, Defendant assesses $35 OD Fees on debit card transactions when there is "enough money in your account to cover a transaction."

79.     As alleged herein, this practice is in breach of Defendant's Contract. Additionally, the practice of charging overdraft fees even when there is sufficient money in the account to cover the transaction is inconsistent with how Defendant describes the circumstances when it assesses overdraft fees in other customer materials.

80.     Further, Defendant has failed to inform customers of the true conditions under which  OD Fees will be assessed in both its Contract and other marketing materials, as alleged herein.

## III.    DEFENDANT ASSESSES TWO OR MORE FEES ON THE SAME ITEM RETURNED FOR INSUFFICIENT FUNDS

81.     The Contract states:

Checking Account Fees

- NSF/Uncollected Funds **Fee**:…………………………..$35.00 **per item**

Exhibit B (emphasis added).

82.    The Contract therefore promises that a "NSF/Uncollected Funds Fee" (singular), will be assessed "per item" (singular).

83.    In breach of this promise, Defendant assesses multiple fees on an item.

84.    The same "item" on an account cannot conceivably become a new one when it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

85.    There is zero indication anywhere in the Contract that the same "item" is eligible to incur multiple fees.

86.    Even if Defendant reprocesses an instruction for payment, it is still the same "item." Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

87.    The Contract never discusses a circumstance where Defendant may assess multiple fees for a single check, electronic payment item, or ACH item that was returned for insufficient funds and later reprocessed one or more times and returned again.

88.    In sum, Defendant promises that one fee will be assessed on an item, and this term must mean all iterations of the same instruction for payment. As such, Defendant breached the Contract when it charged more than one fee per item.

89.    Reasonable consumers understand any given authorization for payment to be one, singular "item," as that term is used in the Contract.

90.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same item will be treated as the same "item," which Defendant will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere do Defendant and its customers agree that Defendant will treat each reprocessing of a check, electronic payment item, or ACH item as a separate item, subject to additional fees.

91.     Customers reasonably understand, based on the language of the Contract, that Defendant's reprocessing of checks, electronic payment items, and ACH items are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger fees. In other words, it is always the same item.

92.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

93.     For example, Community Bank, NA, discloses its fee practice in its online banking agreement as follows:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. ***You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.***

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank N.A. 5 (Nov. 12, 2019), https://bit.ly/3uQafe7 (emphasis added).

94.     Defendant's contract provides no such authorization, and actually promises the opposite— Defendant may charge, at most, a fee, per item.

**B.     Plaintiff's Experience**

19

95.     In support of Plaintiff's claim, Plaintiff offers an example of a fee that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item; and (b) charged a fee upon reprocessing.

96.     On or around October 2, 2017, Plaintiff attempted payment of a single item to ATT.

97.     Defendant returned payment of that item and charged a $35 fee for doing so.

98.     Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around October 3, 2017, Defendant processed the item again, this time rejected the item, and charged Plaintiff a second $35 fee for doing so.

99.     Defendant knew that this transaction was a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

100.     Then, on October 4, 2017, unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, Defendant processed the item for *a third time* and assessed Plaintiff a *third* $35 fee.

101.     Defendant knew that this transaction was also a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

102.     *In sum, Defendant charged Plaintiff $105 in fees on an item.*

103.     Plaintiff understood the payment to be a single item, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

104.     On or around October 25, 2017, Plaintiff attempted payment of a single item to ATT.

105.     Defendant returned payment of that item and charged a $35 fee for doing so.

20

106.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around October 26, 2017, Defendant processed the item again, this time rejected the item, and charged Plaintiff a second $35 fee for doing so.

107.    Defendant knew that this transaction was a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

108.    Then, on October 27, 2017, unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, Defendant processed the item for *a third time* and assessed Plaintiff a *third* $35 fee.

109.    Defendant knew that this transaction was also a reprocessing of the item, as their own account statements designate the item as a "RETRY PYMT."

110.    *In sum, Defendant charged Plaintiff $105 in fees on an item.*

111.    Plaintiff understood the payment to be a single item, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

112.    Defendant assessed Plaintiff multiple fees on an item numerous other times, to the tune of hundreds, or possibly thousands, of dollars.

## IV.    <u>NONE OF THESE FEES WERE ERRORS.</u>

113.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant but rather were intentional charges made by Defendant as part of its standard processing of transactions.

114.    Plaintiff, therefore, had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

115.    Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant decided to charge the fees.

## V.    THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

116.    Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

117.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. However, instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

118.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

22

119.    It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

120.    When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## **CLASS ALLEGATIONS**

121.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following classes.

122.    The proposed Classes are defined as:

**The APSN Class:**
All Defendant checking accountholders who, during the applicable statute of limitations, were checking account holders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized (the "APSN Class").

**The Regulation E Class:**
All US residents who have or have had accounts with Defendant who were opted into the overdraft program for ATM and non-recurring debit card transactions through the use of an opt-in agreement which provided inaccurate or misleading information on Defendant's overdraft program in violation of Regulation E, and were assessed overdraft charges resulting from ATM and/or non-recurring debit card transactions since August 15, 2010 (the "Regulation E Class").

**The Multiple Fee Class:**
All Defendant checking accountholders who, during the applicable statute of limitations, were charged multiple fees on an item by Defendant (the "Multiple Fee Class").

23

123.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

124.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which Defendant has a controlling interest; all customers members who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

125.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, whose identities are within the exclusive knowledge of Defendant and can be ascertained only by resorting to Defendant's records.

126.    Plaintiff's claims are typical of the claims of the Classes in that Plaintiff, like all members of the Classes, was charged improper fees. Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in that they have been assessed unlawful fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

127.    The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Classes.

128.    Among the questions of law and fact common to the Classes include:

    a.    Whether Defendant violated its Contract by charging fees OD Fees on APSN Transactions;

    b.    Whether Defendant violated its Contract by charging multiple fees on an item;

    c.    Whether Defendant had standardized Opt-In Agreements during the Class period that were provided to its customers;

    d.    Whether Defendant's conduct breached the Opt-In Agreement;

    e.    Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

    f.    Whether Defendant breached its covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its fee policies and practices;

    g.    Whether Defendant was unjustly enriched by its fee assessment practices;

    h.    Whether Defendant violated the Unfair Trade Practice and Consumer Protection Act, *RI Gen L § 6-13.1-1 – 29,* through its fee policies and practices;

    i.    The proper method or methods by which to measure damages; and

    j.    The declaratory and injunctive relief to which the Classes are entitled.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses, and Defendant's misconduct will proceed without remedy.

130.    Even if Class members could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would

significantly increase the delay and expense to all parties and the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

131.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

132.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of additional improper fees. Plaintiff and the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal actions.

## CAUSE OF ACTION ONE
### Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Classes)

133.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

134.    Plaintiff and Defendant have contracted for bank account services, as embodied in the Contract. Exs. A-B.

135.    All contracts entered by Plaintiff and the Classes are identical or substantively identical because Defendant's form contracts were used uniformly.

136.    Defendant has breached the express terms of its own agreements as described herein.

137.    Under Rhode Island law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

138.    Good faith and fair dealing mean preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

139.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of the power to specify terms.

140.    Defendant abused the discretion it granted to itself when it charged fees on transactions that did not overdraw an account.

141.    Defendant also abused the discretion it granted to itself when it charged multiple fees on an item.

142.    Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

143.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

144.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Classes.

145.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Contract.

146.    Plaintiff and members of the Classes have sustained damages as a result of Defendant's breaches of contract, including breaches of contract through violations of the covenant of good faith and fair dealing.

147.    Plaintiff and the members of the Classes are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## CAUSE OF ACTION TWO
### UNJUST ENRICHMENT
#### (*On Behalf of Plaintiff and the Classes*)

148.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

149.    Plaintiff, individually and on behalf of the Classes, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claims and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

150.    Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiff and the members of the Classes, who reasonably expect to be compensated for their injury.

151.    Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

152.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Classes and should be required to make restitution to Plaintiff and the members of the Classes.

## CAUSE OF ACTION THREE
## VIOLATION OF THE UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT, *RI Gen L § 6-13.1 - 29.*
### (*On Behalf of Plaintiff and the Classes*)

153.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

154.    Plaintiff and each Class member are persons, as that term is used in RI Gen L § 6-13.1-1(3).

155.    Defendant is a person engaged in the conduct of trade or commerce, as those terms are used in RI Gen L § 6-13.1-1(5).

156.    Defendant's improper assessment and collection of fees is an unfair or deceptive act or practice, pursuant to RI Gen L § 6-13.1-1(6).

157.    Defendant knew or should have known that its policy and practice of assessing these improper fees violated the terms of the Contract.

158.    Defendant's implantation of its fee policies and procedures has injured Plaintiff and each member of the Classes.

159.    Defendant's ongoing implementation of its policy and practice of assessing improper fees will harm Plaintiff and each member of the Classes by forcing them to pay improper fees to defendant.

160.    Plaintiff and each member of the Classes are entitled to actual damages or two hundred dollars ($200), whichever is greater, punitive damages, injunctive and equitable relief, and reasonable attorneys' fees and costs.

### CAUSE OF ACTION FOUR
### VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT
#### (*On Behalf of Plaintiff and the Regulation E Class*)

161.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

162.    Because Defendant's misrepresentations and material omissions as to the operation of the overdraft program, any consent that Defendant obtained for  members of the Regulation E Class' participation in the program was fraudulently induced.

163.    Because the opt-in form was breached and/or consent to participation was fraudulently induced, Defendant failed to comply with 12 C.F.R. § 1005.17, which requires affirmative consent.

164.    Because of Defendant's failure to comply with 12 C.F.R. § 1005.7, it is liable for actual and statutory damages, as well as attorney fees and costs of suit pursuant to 12 U.S.C. 1693m.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Classes, respectfully requests the Court to enter an Order:

a.       certifying the proposed Classes, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as  counsel for the Classes;

b.       declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

c.       enjoining Defendant from breaching its Contract;

d.       awarding Plaintiff and the Classes restitution in an amount to be proven at trial;

e.       awarding actual damages in an amount according to proof;

f.       awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.       awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.       awarding such other relief as this Court deems just and proper.


## JURY DEMAND

Plaintiff, by counsel, demands a trial by jury.


Dated: February 14, 2023                    Respectfully submitted,


                                            /s/ Peter N. Wasylyk
                                            Peter N. Wasylyk
                                            (RI Bar No. 3351)
                                            **Law Offices of Peter N. Wasylyk**
                                            1307 Chalkstone Avenue
                                            Providence, RI 02908
                                            Tel: (401) 831-7730
                                            Fax (401) 861-6064
                                            Email: pnwlaw@aol.com

**KALIELGOLD PLLC**
Sophia G. Gold*
950 Gilman Street, Suite 200
Berkeley, CA 94710
Telephone: (202) 350-4783
Email: sgold@kalielgold.com

Jeffrey D. Kaliel*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 280-4783
Email: jkaliel@kalielgold.com


**JOHNSON FIRM**
Christopher D. Jennings*
Tyler B. Ewigleben*
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
Email: chris@yourattorney.com
Email: tyler@yourattorney.com


*\* Pro Hac Vice* applications to be submitted

*Counsel for Plaintiff and the Proposed Classes*

32